**Case No. 25-3537**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

**ESTATE OF MOHAMMED J. ISAIFAN THROUGH THE ADMINISTRATOR OF HIS ESTATE KIMBERLY VAUGHN**

Appellant

-vs-

**JAMIE REA & MATTHEW AKERS**

Appellees

**On Appeal from the United States District Court**
**For the Northern District of Ohio, Case No. 1:21-cv-2197**

---

# BRIEF OF APPELLEES

---


Scott T. Kamin
Law Offices of Scott T. Kamin
564 E. Losey
Galesburg, IL 61401
scotttkamin@aol.com
*Attorney for Appellant*

Deborah S. Matz
DIRECTOR OF LAW

Brian D. Bremer (0087363)
Kirsten L. Smith (0099074)
ASSISTANT DIRECTORS OF LAW
172 S. Broadway St., Suite 200
Akron, Ohio 44308
(330) 375-2030
(330) 375-2041 (fax)
bbremer@akronohio.gov
klsmith@akronohio.gov
*Attorneys for Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 6th Cir. R. 26.1, Appellees make the following disclosures:

1. Is said party a subsidiary or affiliate of a publicly-owned corporation?

   No.

2. Is there a publicly-owned corporation, not a party to the appeal, which has a financial interest in the outcome?

   No.

/s/ Kirsten L. Smith
Kirsten L. Smith (0099074)

Dated: January 22, 2026

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

STATEMENT CONCERNING ORAL ARGUMENT ........ v

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 1

SUMMARY OF THE ARGUMENT ........ 9

ARGUMENT ........ 11

I. Standard of Review ........ 11

II. Ms. Vaughn has abandoned and forfeited issues on appeal. ........ 12

III. Officer Rea's and Akers's use of force was reasonable. ........ 14

A. Mr. Isaifan's actions gave Officers Rea and Akers probable cause to believe he posed an imminent threat of harm to the officers. ........ 15

CONCLUSION ........ 21

CERTIFICATE OF COMPLIANCE ........ 23

CERTIFICATE OF SERVICE ........ 24

ADDENDUM.......................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Alexander v. CareSource*, 576 F.3d 551 (6th Cir. 2009) .................................................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................... 12

*Bard v. Brown Cty., Ohio*, 970 F.3d 738 (6th Cir. 2020)..................................................... 12

*Barton v. Martin*, 949 F.3d 938 (6th Cir. 2020) ................................................................. 11

*Bell v. Ohio State Univ.,* 351 F.3d 240 (6th Cir.2003)......................................................... 21

*Buetenmiller v. Macomb Cty. Jail*, 53 F.4th 939(6th Cir. 2022)......................................13, 14

*Campbell v. Cheatham County Sheriff's Dept.*, 47 F.4th 463 (6th Cir. 2022) .......................... 16

*Cooper v. City of Columbus*, 6th Cir. No. 22-3251, 2023 WL 1434055............................... 16

*Francis v. Huff*, No. 22-5282, 2022 WL 7973109 (6th Cir. Oct. 14, 2022)..................... 12

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................................13, 14, 15

*Hicks v. Scott*, 958 F.3d 421 (6th Cir. 2020)......................................................................... 15

*Hih v. Lynch*, 812 F.3d 551 (6th Cir. 2016)...................................................................12, 13

*Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019) ............................................................15, 16

*Layne v. Walmart*, 2021 WL 4515397 (6th Cir. Aug. 4, 2021) ........................................ 19

*Lemmon v. City of Akron*, 768 Fed.Appx. 410 (6th Cir. 2019) ....................................16, 18

*Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001)......................................................... 12

*McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997).......................................................13, 14

*Mott v. Mayer*, 524 Fed.Appx. 179 (6th Cir. 2013).......................................................... 12

*Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015) .............................................................. 15

*Scott v. Harris*, 550 U.S. 372 (2007)......................................................................12, 20

*Thomas v. City of Columbus,* 854 F.3d 316 (6th Cir. 2017) ............................................16, 18

*Untalen v. City of Lorain*, 430 F.3d 312 (6th Cir. 2005) ..................................................... 15

## STATEMENT CONCERNING ORAL ARGUMENT

Appellees do not believe that the issues in this case require oral argument because the facts and legal arguments have been adequately presented in the briefs and in the record on appeal. Accordingly, oral argument would not significantly aid the Court in its decision-making process. However, should this Court determine that oral argument is necessary, Appellees will participate.

## STATEMENT OF JURISDICTION

Appellees are in agreement with Ms. Vaughn's jurisdictional statement. *See* Fed. R. App. P. 28(b)(1).

## STATEMENT OF THE ISSUES

I. Ms. Vaughn does not argue that the trial court erred when it granted summary judgment to Appellees for their initial seizure of Mr. Isaifan. Has she abandoned that argument on appeal?

II. This Court has concluded that an Appellant forfeits arguments on appeal when the issues are only adverted to in a perfunctory manner, unaccompanied by an effort at developed argumentation. Without citing to any legal authorities, Ms. Vaughn broadly asserts that Officers Rea and Akers used excessive force based on her own lay opinion of the evidence in this case. Has Ms. Vaughn forfeited this issue on appeal?

III. After repeatedly ignoring officers' commands and resisting Officer Rea's attempt to grab him, Mr. Isaifan turned toward Officer Akers while raising a firearm. Did the trial court correctly determine that there is no genuine dispute of fact that Mr. Isaifan posed an immediate threat to the safety of the officers or others at the time the officers used deadly force?

## STATEMENT OF THE CASE

Nine individuals called 911 on the morning of December 19, 2019, to report a possible one-car accident on Interstate 76 east. (Declaration of David H. Laughlin,

Items 3-6, RE 42-3, Page ID # 185-86). One caller reported that he observed a silver Toyota Camry, later determined to be driven by Mohammed Isaifan, driving very slowly in the left passing lane, coming to a stop, and then backing up into the cement median. (*Id.*, Item 3). The caller reported that the driver exited the car and described him as a white male wearing a purple and grey camouflage outfit and a bulletproof vest. (*Id.*). Police dispatch reported it over the radio as a Signal 9 (suspicious person) or Signal 8 (accident). (*Id.*, Item 1 at 07:27-08:06). Dispatch also stated that the individual was a white male, wearing purple and grey camo with a black vest. (*Id.*).

City of Akron Police Officer Brian Cresswell also received a call from his daughter regarding the vehicle, who described the location of the vehicle and stated that it was hanging out in the fast lane of Interstate 76. (Declaration of Brian Cresswell, RE 42-2, Page ID # 192). Officer Cresswell advised dispatch of the information he received from his daughter and responded to the location of the vehicle. (*Id.*). Officer Cresswell observed the silver Toyota Camry against the center concrete median wall with the rear driver side bumper contacting the wall and discovered that the vehicle was registered to Mohammed Jamal Isaifan, who resided at 1303 Brittain Road in Akron, Ohio. (*Id.* at Page ID # 192-93). Officer Cresswell observed that the driver's door of the Camry was open and several rifle rounds were in plain view in the square shaped center console. (*Id.*). He also observed and recovered an extended handgun magazine on the passenger side floor of the vehicle, a black nylon holster that contained a 9mm handgun, and discovered a black leather wallet that contained the driver's license of Mr. Isaifan. (*Id.*).

Officer Cresswell was concerned for police and public safety after observing the live ammunition rounds and hearing the report that the driver may have a bulletproof vest, and he immediately advised radio dispatch of this information because responding officers were in the area and may have encountered the occupant of the vehicle (*Id.* at Page ID # 193-94; Laughlin Dec., RE 42-3, Page ID# 185-86, Item 1 at 12:58-14:11).

At or around the time that Officer Cresswell was investigating the vehicle, Akron Police Officers Matthew Akers and Jamie Rea were working an extra police job as security for the Akron Metropolitan Housing Authority ("AMHA"). The officers were in full Akron Police uniform and sitting in an unmarked AMHA car in an AMHA property parking lot. (Deposition of Matthew Akers, RE 45, Page ID # 393-97; Deposition of Jamie Rea, RE 46, Page ID # 538). The officers heard the dispatch call over the police radio advising of the abandoned vehicle and a male leaving the vehicle wearing camouflage and a tactical vest. (Akers Depo., RE 45, Page ID # 394-95; Laughlin Dec., RE 42-3, Page ID # 185). The officers also heard Officer Cresswell's report of Mr. Isaifan's identity and the description of the firearm, extended firearm magazines, and rifle rounds. (Akers Depo., RE 45, Page ID # 398; Rea Depo., RE 46, Page ID # 543). Officers Rea and Akers proceeded southbound on Brittain Road to search for Mr. Isaifan in the event he was walking to, or was in the area of, his home on Brittain Road. (Akers Depo., RE 45 at Page ID # 404-408; Rea Depo., RE 46, Page ID # 543). The officers located Mr. Isaifan walking northbound on the east side of Brittain Road and, consistent with radio reports, he was wearing purple and white

camouflage and a tactical vest. (Akers Depo., RE 45 at Page ID # 408-11, 416; Rea Depo., RE 46 at Page ID # 547-49). The officers saw Mr. Isaifan "dart" or jog into a wooded bushy area adjacent to Brittain Road. (*Id.*). Both officers believed Mr. Isaifan to be armed based on the radio traffic reports. (Akers Depo., RE 45 at Page ID # 423; Rea Depo., RE 46 at Page ID # 556-58).

Officer Akers pulled the car over to the curb facing Mr. Isaifan, who had crouched down in the wooded area the officers had observed him "dart" into. (Akers Depo., RE 45 at Page ID # 416). Officer Rea relayed the information over the radio, and both officers exited the vehicle, drew their handguns, and walked toward Mr. Isaifan. (Akers Depo., RE 45 at Page ID # 416, 420-21; Rea Depo., RE 46 at Page ID # 560-61). As the officers approached Mr. Isaifan, Officer Akers announced "Akron Police Department" three to four times, while Officer Rea order him to show his hands and get on the ground. (Akers Depo., RE 45 at Page ID # 421-23; Rea Depo., RE 46 at Page ID # 558-65). Instead of complying with Officer Rea's orders, Mr. Isaifan stood up from his crouched position in the bushes and initially raised his hands, then lowered his hands and walked toward the officers, ignoring Officer Rea's repeated commands to get on the ground. (Akers Depo., RE 45 at Page ID # 429; Rea Depo., RE 46 at Page ID # 566-70). While Officer Akers served as the cover officer, Officer Rea grabbed Mr. Isaifan with his left hand. (Akers Depo., RE 45 at Page ID # 429-31; Rea Depo., RE 46 at Page ID # 570-71). Mr. Isaifan pulled away from Officer Rea and began to walk away. (Akers Depo., RE 45 at Page ID # 433). At this point, Officer

Akers noticed that Mr. Isaifan had a firearm. (*Id.* at Page ID # 436). Mr. Isaifan "stumbled forward, was leaned over at the waist, and the tac[tical] vest rode up and off of, it had to be hiding the pistol, and it rode up and the pistol was exposed on [Mr. Isaifan's] right hip." (*Id.* at Page ID # 436-37).

Officer Akers testified,

A. [Isaifan] took a couple more steps and paused in his stride and jammed his hand down on his pistol to what I could describe when we're teaching firearms to rookies is a master grip. So a master grip is making sure that you get your gun the first time, that you have a sure grip on your pistol. So he came down to the point where I could see his beltline flex down, that's how hard he was pushing down on his gun. And when his, ***when his gun cleared the holster is when I fired my first round. When he was drawing his gun and clearing his holster you could see a clear shift in his hips and his shoulders to start turning towards my direction***, which would have been counterclockwise or turning to the north.

*******

A. I'm just describing how [Isaifan's] feet were at this time, you know, that his feet were in that bladed stance, he is facing away, like you said. But then he, he immediately, as soon as he gets in the stance, it's just a quick pause, and then he jams down on that gun, like I said, gets that master grip. That's the terminology we use when training. So he gets this full on grip on his pistol so hard that it flexes his pants and then the gun clears the holster. While he's drawing the gun out of his holster you can see a significant shift in the hips and shoulders rotating toward me.
At this point I know, I know that the entire time that Officer Rea was to my right, you know. What he's doing at this point, I have no idea, but at this time I know Officer Rea is to my right, and that's when ***Mr. Isaifan starts turning towards me after he draws his pistol out of his holster.***

********

Q. Okay. And then he started turning toward you?

A. Correct.

Q. Okay. And you were firing at him as he turned toward you, right?

A. Yes.

Q. Okay. And did you stop firing at any point?

A. I stopped firing when, when he – when I perceived he was no longer a threat, and that's when I seen his hands were empty and there was no gun.

Q. Okay. So you were firing continuously from the time this guy has almost got a gun pointing toward you, right?

A. From the time I started to the time I stopped, yes, I fired continuously.

Q. Okay. So I'm trying to figure out, does he continue toward you? You said he got face – he proceeded in getting face – facing directly in your direction, right?

A. Yes, he was facing directly towards me.

Q. By the time that the threat had ended?

A. Correct.

Q. Okay. So you're firing at him, and he's continuing to turn toward you?

A. Yes.

Q. Okay. So you fire. Now, do you want him – are you trying to keep him from turning toward you?

A. I'm trying not to die or have Officer Rea not die.

Q. Okay. Well, does he – at some point does he point the gun in the direction of Officer Rea?

A. That I can't tell you. I don't know. Alls I know is that once he drew

that gun out of the holster, I was in – I thought he was either going to try to kill me or Officer Rea, and I didn't stop shooting until he – until I could see his hands were empty.

Q. Okay. So when, when his hands were empty, he was facing toward you?

A. Correct.

Q. Okay.

A. At that point, at that point he was on the ground when I noticed there was nothing in his hands.

Q. Okay. Well, now I'm getting confused. He turned, completely faced toward you, and then he ended up on the ground?

A. During, during the shooting, I was firing as he was heading towards me, and at some point he had fell back down to the ground. I don't know where the gun was at that point, until when he fell, his hands had popped up and I seen that his hands were empty, and that's when I stopped.

Q. Okay. Now, when he fell, he fell down to the ground, did he fall on his back or on his stomach?

A. He fell on his back facing towards me, so he's facing towards me and then fell on his back.

(Akers Depo., RE 45 at Page ID # 439-40, 445, 452-55) (Emphasis added).

Officer Rea testified,

A. *** Now, we know [Mr. Isaifan] has a gun. He's not following any commands whatsoever. We're ordering on the ground. At that point, he unholsters his gun. He reaches down and unlocks his holster and draws it really quick.

Q. Before he drew his gun from his holster, did you order him on the ground?

A. Yes, absolutely.

Q. Okay. So you created distance, and as you were creating distance, you were ordering him to the ground?

A. In that half second, we were telling him on the ground and trying to create as much distance as I could. All within not even a few seconds. If it was even a second, I'd be surprised if it was that long. I just had hands on with him.

Q. And – okay. You're ordering just for a second or less, and while you're doing that, he unlocks his gun and then grabs it out?

A. When say unlock, I'm talking about he unholsters his gun.

Q. Okay. So it's not unlocked, it just means un---?

A. Yeah. He unholsters his gun. I don't know – I have no idea what his retention level was on that holster. I just know he reached down and unholstered his gun real quick.

Q. Okay. When he unholstered the gun, then what happened?

A. Well. As he's unholstering his gun, he turns. He unholsters it as he's taking a step and turns. He shifted towards us – I'm sorry. Not towards me, he shifted towards Officer Akers. It was all one motion.

*******

A. ***I fired when [Isaifan's] body shifted and his body spun with his gun*** all at the same time. It wasn't – the gun did not shift and then his body followed. It was all one motion. He was – it was clear to me, 100 percent clear to me that he was turning with his firearm in his hand towards Officer Akers.

(Rea Depo., RE 46 at Page ID # 580-82) (Emphasis added). Once Mr. Isaifan fell, his firearm was laying on the ground next to him. (Akers Depo., RE 45 at Page ID # 455).

Officer Akers fired a total of ten shots, and Officer Rea fired a total of four shots. (Declaration of David Whiddon, RE 42-3, Page ID # 206). The City of Akron Fire

Division's Emergency Medical Service ("EMS") responded to the scene, and upon arrival the paramedics examined Mr. Isaifan and detected no pulse or breathing and showed asystole in three leads. (Declaration of Christopher Karakis, Item 1, RE 42-4, Page ID # 286, 288).

Summit County Medical Examiner Dr. Lisa Kohler performed an autopsy on Mr. Isaifan, who was pronounced dead at the scene. (Declaration of Lisa J. Kohler, MD, RE 42-5, Page ID # 290-91). Forensic ballistics expert, Richard N. Ernest, opined that the layout of the physical evidence at the scene, including the overall pattern of the fired cartridge cases, the positioning of the officers during the event, and the overall pattern of the shots to Mr. Isaifan is consistent with the accounts given by the officers in this highly dynamic shooting event. (Declaration of Richard N. Ernest, RE 42-6, Page ID # 304, 329). Crime shooting scene reconstruction and evidence specialist Scott G. Roder expressed the opinion that the physical and forensic evidence is consistent with the officers' testimony to a reasonable degree of scientific certainty. (Declaration of Scott G. Roder, RE 42-7, Page ID # 331, 360).

## SUMMARY OF THE ARGUMENT

I. This Court has concluded that an appellant abandons arguments on appeal that she does not raise in her initial brief. Ms. Vaughn does not raise any argument that the trial court erred when it concluded that Officer Rea and Officer Akers were entitled to qualified immunity for their initial seizure of Mr. Isaifan. Accordingly, she has abandoned that issue on appeal.

Additionally, this Court has concluded that an appellant abandons issues on appeal when those arguments are only adverted to in a perfunctory manner. Ms. Vaughn broadly asserts that Officers Rea and Akers used excessive force and that the trial court erred because there is a genuine dispute of fact as to whether Mr. Isaifan posed an imminent threat of harm at the time the officers used excessive force. However, she cites no legal authorities and only raises this argument in a perfunctory manner. Accordingly, she has forfeited any argument on appeal and this Court should affirm the decision of the trial court.

II. The trial court correctly concluded that Officers Rea and Akers were entitled to qualified immunity and granted summary judgment on Ms. Vaughn's excessive force claim because there is no genuine dispute of material fact that the officers did not violate Mr. Isaifan's Fourth Amendment rights when they used deadly force. On appeal, Ms. Vaughn argues that the district court erred because there is a question of fact as to whether Mr. Isaifan attempted to turn in the direction of the officers and whether he was carrying or pointing a firearm at the time the officers used deadly force. In doing so, Ms. Vaughn appears to be asserting, as she did below, that Officers Rea and Akers used deadly force to prevent Mr. Isaifan's escape. Notwithstanding that there is nothing in the record to support Ms. Vaughn's assertion that officers used deadly force to prevent Mr. Isaifan's escape, it matters not whether he was

attempting to escape because, at the time the officers used deadly force, Mr. Isaifan posed a threat of imminent harm to the officers. Additionally, Ms. Vaughn's argument is wholly unsupported by legal authorities and is instead based on (1) her own interpretation of a blurry surveillance video, taken from far away in which the key moments of the incident are obstructed by trees; (2) the testimony of an eyewitness who did not witness the moments leading up to the officers' use of deadly force; and (3) her own lay opinion of the autopsy report. Additionally, Ms. Vaughn offers no argument beyond her conclusory assertion that, based on her speculative version of the facts, the force employed by Officers Rea and Akers was excessive in violation the Fourth Amendment. Accordingly, Ms. Vaughn's arguments are without merit and this Court should affirm the district court's order granting summary judgment in favor of Officers Rea and Akers.

## ARGUMENT

### I. Standard of Review

This Court reviews a district court's granting of summary judgment on grounds of qualified immunity under a de novo standard of review. *Barton v. Martin*, 949 F.3d 938, 946 (6th Cir. 2020). This Court may reverse a district court's grant of qualified immunity to defendants on appeal only where fundamental factual disputes preclude summary judgment. *Mott v. Mayer*, 524 Fed.Appx. 179, 189 (6th Cir. 2013). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (Emphasis in original). When applying the summary judgment standard, the court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). However, "[a] bare assertion disagreeing with how physical evidence should be interpreted does not create a genuine, material dispute of fact for purposes of summary judgment." *Francis v. Huff*, No. 22-5282, 2022 WL 7973109, *3 (6th Cir. Oct. 14, 2022). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009). Additionally, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. Ms. Vaughn has abandoned and forfeited issues on appeal.

"An appellant abandons issues not raised and argued in his initial brief on appeal." *Hih v. Lynch*, 812 F.3d 551, 556 (6th Cir. 2016); *Bard v. Brown Cty., Ohio*, 970 F.3d 738, 751 (6th Cir. 2020). Additionally, "in instances where '[i]ssues [are] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,' [this Court] considers them forfeited." *Buetenmiller v. Macomb Cty. Jail*,

53 F.4th 939, 946 (6th Cir. 2022), quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (Brackets in original).

Ms. Vaughn makes no argument on appeal that the trial court erred when it concluded that Officers Rea was entitled to qualified immunity for his initial seizure of Mr. Isaifan when he grabbed Mr. Isaifan's arm because the officers had probable cause to stop him. (Memorandum Opinion and Order, RE 64, Page ID #: 1101). Accordingly, Ms. Vaughn has abandoned that issue on appeal. *Lynch* at 556.

Ms. Vaughn asserts that there is a genuine dispute regarding whether Officers Rea and Akers used excessive force, but her argumentation is limited to one of the three factors courts examine in evaluating the objective reasonableness of a use of force articulated by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989): that Mr. Isaifan did not pose an immediate threat to the safety of the officers or others at the time force was used. Specifically, Ms. Vaughn asserts that there is a genuine dispute of material fact as to whether Mr. Isaifan was turning toward the officers and whether he had a firearm in his hand at the time the officers employed deadly force. Ms. Vaughn develops no argument as to the remaining *Graham* factors (the severity of the crime and issue and whether Mr. Isaifan was actively resisting arrest or attempting to flee[1]) and,

[1] Vaughn does not challenge the trial court's determination regarding the severity of the crime at issue and, since her argument is that he was walking away at the time force was

therefore, has abandoned those issues on appeal.

As to the one *Graham* factor that Ms. Vaughn does address on appeal, she makes no argument beyond her conclusory assertion that, accepting her unsupported and speculative version of the facts as true, Officers Rea and Akers used excessive force. Thus, to the extent Ms. Vaughn has developed any argument regarding whether there is a question of fact on the issue of excessive force, she has done so in a perfunctory manner that is unaccompanied by any effort at argumentation as to why the trial court erred in concluding that no excessive force occurred here. *See Buetenmiller* at 946, quoting *McPherson* at 995-96. Even if this Court were to accept Ms. Vaughn's unsupported version of the facts, she has forfeited any argument on appeal that the trial court erred when it concluded that Officers Rea and Akers were entitled to qualified immunity on her excessive force claim.

Accordingly, this Court should affirm the decision of the trial court granting summary judgment to Officers Rea and Akers.

## III. The officers' use of force was reasonable.

Should this Court choose to address Ms. Vaughn's argument, the trial court correctly determined that there is no genuine dispute of fact to be litigated on the excessive force claim. On appeal, Ms. Vaughn asserts there is a dispute of fact as to

---

used, she seemingly does not dispute the trial court's finding that Mr. Isaifan was resisting or *evading* arrest.

whether Mr. Isaifan was turning in the direction of the officers with a firearm at the time the officers used deadly force. As noted above, Ms. Vaughn's argumentation is limited to one of the three *Graham* factors: that Mr. Isaifan did not pose an immediate threat to the safety of the officers or others at the time force was used and, therefore, Appellees will limit their argument accordingly.

**A. Mr. Isaifan's actions gave Officers Rea and Akers probable cause to believe he posed an imminent threat of harm to the officers.**

Qualified immunity is available where officers make split-second decisions in the face of serious physical threats to themselves or others. *Mullins v. Cyranek*, 805 F.3d 760, 766-67 (6th Cir. 2015). In excessive force cases "deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.' " *Id.* at 766, quoting *Untalen v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). In other words, an officer must reasonably believe he individual poses a danger of serious physical harm to himself or others to justify deadly force. *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019). While mere possession of a firearm is not enough, *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020), this Court has concluded that when other indicia creating a safety risk to the officer is present, deadly force is warranted. *Campbell v. Cheatham County Sheriff's Dept.*, 47 F.4th 463, 480 (6th Cir. 2022), citing *Thomas v. City of Columbus*, 854 F.3d 361, 365-66 (6th Cir. 2017) (use of deadly force reasonable where suspect with gun in hand ran directly at officer); *see also Thornton v. City of Columbus*, 727 Fed. Appx. 829, 837 (6th Cir. 2018) (use of deadly force reasonable where suspect

holding rifle walked to within a close proximity of officers, ignored officers' commands and officers were aware suspect previously threated an individual with the firearm); *Lemmon v. City of Akron*, 768 Fed. Appx. 410, 414 (6th Cir. 2019) (affirming district court's granting of summary judgment on deadly force claim where suspect's sudden movement towards the officer while his hand was positioned inside the front of his pants reasonably placed the officer in imminent fear of serious physical injury to employ deadly force). Consequently, aiming a weapon at an officer is not a minimum requirement to use deadly force. *Cooper v. City of Columbus*, 6th Cir. No. 22-3251, 2023 WL 1434055, citing, *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) ("[A]n officer need not face the business end of a gun to use deadly force.").

Officers Rea and Akers possessed knowledge that Mr. Isaifan abandoned his vehicle on the highway, the vehicle contained a firearm with several rounds of ammunition, and Mr. Isaifan was wearing purple camouflage with a tactical vest. Upon locating Mr. Isaifan, he left the sidewalk and crouched down in the bushes at a nearby residence. The officers, dressed in Akron Police uniform, announced themselves and gave verbal commands for Mr. Isaifan to show his hands and get on the ground. Mr. Isaifan ignored the commands and continued to proceed directly at Officer Rea, causing him to attempt to physically apprehend Mr. Isaifan. (Akers Depo., RE 45 at Page ID # 421-23; Rea Depo., RE 45, Page ID # 565-73). As Officer Rea was attempting to apprehend Mr. Isaifan, Officer Akers observed Mr. Isaifan carrying a firearm in a holster and warned Officer Rea, which caused him to release Mr. Isaifan. (Akers Depo.,

RE 45 at Page ID # 436-39). Both officers issued commands for Mr. Isaifan to get on the ground, but instead, he walked a few steps past the officers, drew his firearm, and began turning toward Officer Akers. (Rea Depo., RE 46 at Page ID # 581-82, 595).

Once Mr. Isaifan's gun cleared the holster and he began turning toward Officer Akers, the officers fired their weapons. Officer Rea testified that he fired when Mr. Isaifan's body shifted and spun with his gun all at the same time. (*Id.* at Page ID # 582. He further testified that it was "100 percent clear to [him] that [Mr. Isaifan] was turning with his firearm in his hand towards Officer Akers." (*Id.*). Officer Akers testified that, after he yelled to Officer Rea that Mr. Isaifan had a gun, Mr. Isaifan took a few more steps, paused in his stride, and jammed his hand down on his pistol to what Officer Akers described as a "master grip." (Akers Depo., RE 45 at Page ID # 439-40. He further testified that the master grip caused Mr. Isaifan's beltline to flex down, indicating how hard he was pushing down on his gun. (*Id.*). Officer Akers then saw Mr. Isaifan's gun clear his holster, at which point Officer Akers fired his first round. (*Id.*). As Mr. Isaifan was drawing his gun and clearing his holster, Officer Aker observed "a clear shift in his hips and his shoulders to start turning towards [Aker's] direction[.]" (*Id.*). Thus, the first shots hit Mr. Isaifan in the back as he was turning toward the officers, and the last shots hit him in the chest area. (Rea Depo., RE 46 at Page ID # 592). Once Mr. Isaifan fell, his firearm was laying on the ground next to him. (Akers Depo., RE 45 at Page ID # 455).

The medical and physical evidence in this case support the officers' testimony. The Appellees' expert witness, Richard Ernest, concluded that the forensic evidence indicates that Mr. Isaifan was turning and bending while Officers Rea and Akers were firing, which is consistent with the testimony of the officers. (Ernest Dec., RE 42-6, Page ID # 304, 329). Expert Scott Roder also testified that the physical and forensic evidence, as well as the CGI reconstruction of the incident, are consistent with the officers' testimony that Mr. Isaifan was turning when he was shot. (Roder Dec., RE 42-7, Page ID # 331, 360).

Officer Rea and Akers decided to employ deadly force after Mr. Isaifan ignored commands to show his hands and get on the ground, suddenly drew a firearm, and began to turn toward Officer Akers while in close proximity to the officers, who were not behind any protective cover. Therefore, Mr. Isaifan's threat to the officers meets or exceeds the immediate threat paradigm articulated in *Jordan, Thomas*, *Thornton,* and *Lemmon*. Accordingly, Officers Rea and Akers had probable cause to believe that Mr. Isaifan posed a threat of severe physical harm to themselves. The trial court correctly determined as much and concluded that the officers' use of deadly force was objectively reasonable given the totality of the circumstances. (Order, RE 64, Page ID # 1109).

Nevertheless, relying on surveillance video, testimony from Michael Williams, and her lay opinion of the autopsy report, Ms. Vaughn asserts that there is a genuine dispute of fact as to whether Mr. Isaifan was walking away from the officers and holding a handgun at the time they used deadly force. However, as the trial court correctly

determined, Ms. Vaughn's argument is based on her own interpretation of the evidence. *See* (Order, RE 64, Page ID #: 1105). There is no valid evidence in the record to conclude that there is a genuine dispute of fact regarding whether Mr. Isaifan was fleeing at the time Officers Rea and Akers used deadly force.

The surveillance footage relied on by Ms. Vaughn is of poor quality and, given the distance of the camera from the actual incident, as well as the view being obstructed by trees and shrubs, it is not discernable from the video whether Mr. Isaifan was turning towards Officer Akers with a drawn firearm at the time of the shooting. *See* (Whiddon Dec., Item 5, RE 42-3, Page ID# 208, 09:01:38-09:01:43). Ms. Vaughn's unfounded assertion that the "surveillance footage shows [Mr. Isaifan] running away from the defendants and being shot in the back" is purely speculative and insufficient to create a genuine issue of material fact for trial. (Appellant's Brief at 11-12). Thus, given the poor quality of the video, the trial court correctly concluded as a matter of law that the jury would be unable to confirm or deny Ms. Vaughn's assertion that Mr. Isaifan was walking away at the time of the shooting. *Layne v. Walmart*, 2021 WL 4515397, *3 (6th Cir. Aug. 4, 2021).

Nor does the testimony of Michael Williams create a genuine dispute of fact. It is apparent that Mr. Williams did not observe the officers and Mr. Isaifan when the initial shooting began. Mr. Williams testified that observed the shooting after he heard one shot and jumped up to look out the window. (Deposition of Michael Williams, RE 47, Page ID # 691). He also testified that he heard two or three shots before looking

out the window. (Williams Depo., RE 47 at Page ID # 691-92, 744). Regardless of whether he heard one, two, or three shots before looking out the window, Mr. Williams only looked out the window ***after*** the Officers made the decision to employ deadly force. As the surveillance footage does show, the time Mr. Isaifan walks past Officer Rea until Mr. Isaifan falls to the ground is approximately five seconds. (Whiddon Dec., Item 5, RE 42-3, Page ID# 208, 09:01:38-09:01:43). Moreover, Mr. Williams testified that he did not see whether Mr. Isaifan turned toward the officers. (Williams Depo., RE 47 at Page ID # 703). As such, Mr. Williams only has personal knowledge regarding a small duration of the incident and cannot create a genuine dispute of fact as to whether Mr. Isaifan posed an imminent threat at the time the officers decided to employ deadly force. Finally, Mr. Williams's testimony that the officers shot Mr. Isaifan in the back as he was running away is blatantly contradicted by the objective medical evidence, which establishes that Mr. Isaifan was shot six times in the front of his body. (Declaration of Lisa J. Kohler, MD, RE 42-5, Page ID # 295-98); *Harris*, 550 U.S. at 380. Accordingly, the trial court correctly concluded that Mr. Williams's testimony does not create a genuine dispute of fact for trial.

Finally, Ms. Vaughn asserts that the autopsy report corroborates the surveillance footage because "the vast majority of the entry wounds entered [Mr. Isaifan's] back. (Appellant's Brief at 12). Again, the autopsy report establishes that Mr. Isaifan was shot six times in the front and is consistent with the officers' testimony that Mr. Isaifan was

turning toward them as he was shot. Thus, Ms. Vaughn's own interpretation of the medical evidence in this case does not establish a genuine dispute for trial.

As argued above, the expert opinions of Scott Roder and Richard Ernest establish that the physical evidence in this case is consistent with the officers' testimony. Ms. Vaughn did not come forward with any contrary expert testimony in the trial court and instead relied on her own lay opinion of the evidence. Such "conclusory and unsupported allegations, rooted in speculation," are insufficient to create a genuine dispute of material fact for trial. *Bell v. Ohio State Univ.,* 351 F.3d 240, 253 (6th Cir.2003).

## CONCLUSION

The trial court correctly concluded that there is no genuine dispute of fact that Mr. Isaifan posed an imminent threat of serious harm to the officers at the time Officers Rea and Akers used deadly force and that their use of deadly force was reasonable under the circumstances. Thus, Officers Rea and Akers are entitled to qualified immunity on Ms. Vaughn's excessive force claim. Accordingly, and for the foregoing reasons, this Court should affirm the decision of the District Court granting summary judgment in favor of Appellees.

Respectfully submitted,

Deborah S. Matz
DIRECTOR OF LAW

/s/ Kirsten L. Smith
Brian D. Bremer (0087363)
Kirsten L. Smith (0099074)
ASSISTANT DIRECTORS OF LAW

172 S. Broadway St., Suite 200
Akron, Ohio 44308
(330) 375-2030
(330) 375-2041 (fax)
bbremer@akronohio.gov
klsmith@akronohio.gov
*Attorneys for Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the foregoing Brief complies with the type-volume limitations, typeface requirements, and type style requirements of the Federal Rules of Appellate Procedure in the following manner:

1. The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,862 words, including footnotes and endnotes, but excluding the cover page, table of contents, table of authorities, designation of relevant district court documents, statement regarding oral argument, certificate of compliance, and certificate of service.

2. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. Ap. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Roman type style.

/s/ Kirsten L. Smith
Kirsten L. Smith (0099074)

## CERTIFICATE OF SERVICE

This is to certify that a true and accurate copy of the foregoing Brief of Appellee was filed electronically this 22nd date of January, 2026. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Kirsten L. Smith
Kirsten L. Smith (0099074)

## ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

In accordance with 6 Cir. R. 30(g), Appellee hereby designates the following relevant district court documents:

| Record Entry | Description | Page ID # |
|---|---|---|
| 42-1 | Declaration of David H. Laughlin | 184-190 |
| 42-2 | Declaration of Brian Cresswell | 191-204 |
| 42-3 | Declaration of David Whiddon | 205-285 |
| 42-4 | Declaration of Christopher Karakis | 286-289 |
| 42-5 | Declaration of Lisa J. Kohler, MD | 290-303 |
| 42-6 | Declaration of Richard N. Ernest | 304-330 |
| 45 | Deposition of Matthew Akers | 366-511 |
| 46 | Deposition of Jamie Rea | 512-645 |
| 47 | Deposition of Michael Williams | 646-747 |
| 64 | Memorandum Opinion and Order | 1089-1110 |