**Appeal No. 25-3537**

---

**In the United States Court of Appeals**
**For the Sixth Circuit**

---

**KIMBERLY VAUGHN, through the Administration of the Estate of Mohammad J. Isaifan, deceased,**

**Plaintiff-Appellant,**

**v.**

**JAMES REA and MATTHEW AKERS,**
**Defendants-Appellants.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO (Cleveland)**
**Hon. David Ruiz**
**District Court Docket No: 1:21-CV-02197**

---

# APPELLANT'S PETITON FOR REHEARING EN BANC

---

Robert L. Sirianni, Jr., Esquire
BROWNSTONE, P.A.
P.O. Box 2047
Winter Park, Florida 32790
Tel: 407-388-1900
Fax: 407-622-1511
robertsirianni@brownstonelaw.com
*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................2

TABLE OF AUTHORITIES....................................................3

STATEMENT REQUIRED BY FED. R. APP. P. 35(b)(1)....................................................4

INTRODUCTION....................................................4

BACKGROUND....................................................5

ARGUMENT....................................................6

I. THE PANEL DECISION CONFLICTS WITH KEITH v. GRIFFITHS ON THE PHYSICAL-FACTS RULE AND THE WEIGHT OF EYEWITNESS TESTIMONY....................................................6

II. THE PANEL DECISION CONFLICTS WITH *WILLIAMS v. CITY OF CANTON* ON THE APPLICATION OF B*ARNES v. FELIX*....................................................7

III. THE PANEL FAILED TO APPLY THE "PARTICULAR CARE" STANDARD FOR LONE-SURVIVOR CASES....................................................8

IV. THE DEGREE-OF-FORCE ISSUE PRESENTS A QUESTION OF EXCEPTIONAL IMPORTANCE....................................................8

CONCLUSION....................................................9

CERTIFICATE OF COMPLIANCE....................................................10

CERTIFICATE OF SERVICE....................................................10

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)......................................7

*Barnes v. Felix*, 605 U.S. 73 (2025) ........................................................................5

*Keith v. Griffiths,* No. 24-3444, 2025 LX 145364 (6th Cir. June 6, 2025) ...............4

*Plumhoff v. Rickard*, 572 U.S. 765 (2014)..................................................................8

*Vaughn v. Rea*, No. 25-3537, slip op. at 5-7 (6th Cir. May 4, 2026) ........................4

*Williams v. City of Canton,* 168 F.4th 933 (6th Cir. 2026)........................................4

## STATEMENT REQUIRED BY FED. R. APP. P. 35(b)(1)

The panel decision conflicts with two published decisions of this Court: *Keith v. Griffiths,* No. 24-3444, 2025 LX 145364 (6th Cir. June 6, 2025), and *Williams v. City of Canton,* 168 F.4th 933 (6th Cir. 2026); that squarely address the summary-judgment standard in Fourth Amendment excessive-force cases. This case also raises a question of exceptional importance: whether a court may grant summary judgment on qualified immunity when the medical examiner's findings are facially consistent with the plaintiff's flight theory as well as the officers' rotation theory, and when an eyewitness and surveillance footage corroborate a version of events in which the decedent was moving away from--not toward--the officers at the moment the first shot was fired.

## INTRODUCTION

On May 4, 2026, the panel affirmed summary judgment for two officers who fired fourteen rounds at Mohammad Isaifan, killing him. The panel held that no genuine dispute of material fact existed because: (1) the surveillance footage was too obstructed to contradict the officers' account; (2) eyewitness Michael Williams looked out his window only after the shooting started; and (3) the autopsy and forensic experts corroborated the officers' rotation theory. *Vaughn v. Rea*, No. 25-3537, slip op. at 5-7 (6th Cir. May 4, 2026).

Each of those holdings is in tension with this Court's contemporaneous decisions in *Keith* and *Williams*. Those decisions establish that: (1) eyewitness testimony that a suspect was *running away*, even from a witness with partial

visibility, creates a triable issue of fact; (2) medical-examiner findings consistent with *either* the officers' account or the plaintiff's account defeat summary judgment under the physical-facts rule; and (3) courts applying *Barnes v. Felix*, 605 U.S. 73 (2025), must consider all pre-encounter circumstances--including facts undermining the claimed threat--not only the contested final seconds.

En banc review is warranted to harmonize the Court's summary-judgment standard across these three cases and to provide district courts, Section 1983 litigants, and law-enforcement agencies a coherent rule.

## BACKGROUND

Officers Akers and Rea were moonlighting for the Akron Municipal Housing Authority when they heard dispatch report that an abandoned vehicle registered to Mohammad Isaifan contained a handgun and ammunition. Without being dispatched to make a pedestrian stop, they drove down Brittain Road, spotted Isaifan walking northbound, and on their own initiative decided to intercept him. Slip op. at 2.

Surveillance footage captured the encounter up to the moment the parties stepped behind a grove of trees. The footage shows: the officers drawing weapons and approaching; Isaifan raising both hands; a brief struggle in which Rea unsuccessfully grabbed for Isaifan; and then--for five seconds--nothing, because trees and a pole obstructed the camera. *Id.* at 2-3. Both officers then fired fourteen rounds. *Id.* at 3.

Three sources of record evidence supported Plaintiff. First, eyewitness Michael Williams saw the officers behind Isaifan, shooting him in the back as he fell forward, and did not observe Isaifan hold or point a firearm. R. 56, MW Tr. PageID 54, 58-63. Second, the autopsy documented seven shots to the back and buttocks, five shots to the left side, and three shots to the front--a distribution equally

consistent with a suspect stumbling forward after being shot as with one rotating to fire. R. 56, Ex. G. Third, Defendant Akers confirmed the accuracy of the surveillance footage in his own deposition. R. 45, Akers Tr. PageID 106.

The district court granted summary judgment. The panel affirmed, resolving all three evidentiary sources in the officers' favor.

## ARGUMENT

### I. THE PANEL DECISION CONFLICTS WITH KEITH v. GRIFFITHS ON THE PHYSICAL-FACTS RULE AND THE WEIGHT OF EYEWITNESS TESTIMONY.

In *Keith v. Griffiths*, this Court reversed a summary-judgment grant on nearly identical facts. Officer Griffiths testified that Keith turned and raised a gun toward him before Griffiths fired. Two juvenile eyewitnesses testified that Keith was running away when the shots were fired. The medical examiner's findings were ambiguous--consistent with either account. This Court held that the physical-facts rule applies only where undisputed physical evidence *positively contradicts* a witness's testimony; where forensic evidence merely *permits* either conclusion, the credibility question belongs to the jury. *Keith* (citing *Harris v. Gen. Motors Corp.*, 201 F.3d 800, 803 (6th Cir. 2000)).

The panel here reached the opposite conclusion on materially indistinguishable facts. The medical examiner stated the wound pattern supported a "reasonable assumption" that Isaifan was "rotating during the actual shooting." Slip op. at 6-7. But that statement describes *consistency*, not contradiction. A suspect stumbling and falling after being shot in the back would present the same frontal-wound pattern as one who was rotating to fire. Neither the medical examiner nor the government's ballistics expert excluded Plaintiff's theory of the case. Under *Keith*,

that forensic equipoise defeats the physical-facts rule and requires denial of summary judgment.

*Keith* also held that eyewitnesses need not have seen the decedent's hands to create a triable issue--their testimony about the *direction of movement* was independently material. *Keith*. Here, Williams testified that the officers were behind Isaifan, shooting him in the back as he fell forward, and that Isaifan never held a firearm in his right hand--the hand the officers claimed held the gun. R. 56, MW Tr. PageID 54. The panel dismissed this testimony because Williams observed the *ongoing* shooting rather than its precise initiation. But Williams's account directly contradicts the officers' claim that the decedent was turned and pointing a weapon at the moment fire began. That factual conflict is a jury question under *Keith* and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) .

## II. THE PANEL DECISION CONFLICTS WITH *WILLIAMS v. CITY OF CANTON* ON THE APPLICATION OF B*ARNES v. FELIX*.

In *Williams v. City of Canton*, this Court explicitly applied *Barnes v. Felix*, 605 U.S. 73 (2025), to hold that the Fourth Amendment reasonableness inquiry must consider *all facts that a reasonable officer should have known before opening fire*--not only the final moments of confrontation. The *Williams* court emphasized the absence of 911 calls reporting violence, the officer's own admission that he did not know the suspect's intentions, and the misdemeanor nature of the underlying conduct--all pre-encounter context material to whether probable cause for deadly force existed. *Id.*

The panel here conducted a truncated analysis focused almost exclusively on the five-second obstructed interval. It did not assess the pre-encounter facts through the *Barnes* lens: the officers were not dispatched to intercept Isaifan; they acted on

their own initiative; they drew weapons immediately upon spotting him; and the minutes of the encounter visible on camera showed Isaifan initially raising his hands in compliance. Under *Williams* and *Barnes*, those facts "inform the reasonableness" of the ultimate decision to fire. *Barnes*, 605 U.S. at 80-81. The panel's failure to conduct that analysis conflicts with this Court's approach in *Williams*.

## III. THE PANEL FAILED TO APPLY THE "PARTICULAR CARE" STANDARD FOR LONE-SURVIVOR CASES.

Where "a police officer is the lone survivor of the encounter giving rise to the plaintiff's claims, we take 'particular care' in assessing the district court's grant of summary judgment." *Keith* (quoting *Roberts v. Cruz*, Nos. 22-5687/22-5701, 2023 WL 2181145, at *2 (6th Cir. Feb. 23, 2023)). Isaifan is dead. The only witnesses to the five-second interval are the two officers whose conduct is the subject of suit. Accepting their frame-by-frame account wholesale--and then deploying government-retained experts to corroborate it--is the precise outcome the particular-care doctrine is designed to prevent. The panel cited the standard but did not meaningfully apply it. That failure, combined with the inter-panel conflicts identified above, independently warrants en banc review.

## IV. THE DEGREE-OF-FORCE ISSUE PRESENTS A QUESTION OF EXCEPTIONAL IMPORTANCE.

Even if the initial shots were constitutionally permissible, the continued volley of fourteen rounds, including shots to the buttocks as Isaifan was falling forward, raises a distinct degree-of-force question under *Plumhoff v. Rickard*, 572 U.S. 765 (2014): did the officers stop shooting once the threat was neutralized? The panel resolved this solely by crediting the officers' testimony that they stopped "when [they] could tell his hands were empty." Slip op. at 5. But the autopsy documents posterior shots-

-to the back and buttocks--that are consistent with a suspect who was already falling and incapacitated, not still posing a forward-facing threat. Whether the officers ceased fire at the earliest reasonable moment is a factual question that should have gone to the jury. This issue recurs across Section 1983 deadly-force cases and merits clarification by the full Court.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Court grant rehearing en banc, vacate the panel opinion, and remand for further proceedings consistent with this Court's decisions in *Keith v. Griffiths* and *Williams v. City of Canton*.

Respectfully submitted,

*/s/ Robert L. Sirianni, Jr., Esquire*
Robert L. Sirianni, Jr., Esquire
BROWNSTONE, P.A.
P.O. Box 2047
Winter Park, Florida 32790
Tel: 407-388-1900
Fax: 407-622-1511
robertsirianni@brownstonelaw.com
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitation of Sixth Circuit Rule 35(a) because it contains fewer than 3,900 words, excluding the parts exempted by Fed. R. App. P. 32(f). It complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in Times New Roman 14-point font.

*/s/ Robert L. Sirianni, Jr., Esquire*
Robert L. Sirianni, Jr., Esquire

## CERTIFICATE OF SERVICE

I certify that on May 18, 2026, I electronically filed the foregoing with the Clerk of the Sixth Circuit via CM/ECF, which will send notification to all registered counsel of record.

*/s/ Robert L. Sirianni, Jr., Esquire*
Robert L. Sirianni, Jr., Esquire

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0129p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

KIMBERLY VAUGHN, through the Administration of the Estate of Mohammad J. Isaifan, deceased,
*Plaintiff-Appellant*,

*v*.

JAMES REA; MATTHEW AKER,
*Defendants-Appellees*.

No. 25-3537

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:21-cv-02197—David A. Ruiz, District Judge.

Decided and Filed: May 4, 2026

Before: THAPAR, BUSH, and MURPHY, Circuit Judges.

## COUNSEL

**ON BRIEF:** Scott T. Kamin, LAW OFFICES OF SCOTT T. KAMIN, Galesburg, Illinois, for Appellant. Brian D. Bremer, Kirsten L. Smith, CITY OF AKRON, Akron, Ohio, for Appellees.

## OPINION

THAPAR, Circuit Judge. In the span of five seconds, a noncompliant suspect drew his gun and turned toward two police officers. The officers fatally shot him. The district court granted the officers qualified immunity, and we affirm.

I.

One morning, multiple callers reported to police dispatchers that a driver had backed his car into a concrete median on the highway. The driver had abandoned his car, which was partially blocking the fast lane. One caller reported that the driver was wearing a purple and gray camouflage outfit and what looked like a bulletproof vest.

A nearby officer responded to the abandoned car. Through the open driver-side door, he spotted several rifle rounds, an extended handgun magazine, and a handgun in a holster. He also found a driver's license belonging to Mohammad Jamal Isaifan. After running the car's plates, he discovered that the vehicle was registered to Isaifan, who had a listed address on Brittain Road in Akron, Ohio. The officer relayed this information to dispatch.

Officers Matthew Akers and James Rea were parked near Isaifan's address on Brittain Road. While parked, they heard dispatch describe what happened and what the responding officer found in the car. Based on those reports, Akers and Rea believed Isaifan was armed—and likely nearby. They drove down Brittain Road to see whether Isaifan was walking home from the highway. A few minutes later, they spotted a man wearing a tactical vest and purple and gray camouflage who matched Isaifan's description.

The first few moments of the officers' interaction with Isaifan were captured on grainy surveillance footage. When he saw the officers pulling over, Isaifan jogged into a wooded, bushy area near the road and ducked out of sight. The officers then drew their weapons and followed him into the shrubs, repeatedly identifying themselves as "Akron Police Department." R. 45, Pg. ID 421. As Isaifan came into view, the officers ordered him to raise his hands and get on the ground. Isaifan initially started to raise his hands, holding unidentified objects in both.

But he then stopped "following any commands whatsoever." R. 46, Pg. ID 580. Despite continuous commands to keep his hands up, Isaifan lowered them. He appeared to be "cupping something larger in his hand," which Rea initially worried was a grenade. *Id.* at 568–69. Isaifan then started walking toward the officers with a detached stare. When he got within arm's reach, Rea grabbed for him, but Isaifan twisted out of his grip. As they struggled, Isaifan stumbled and

his vest moved up, giving Akers a clear view of a pistol on Isaifan's right hip. Akers then yelled, "Gun!" R. 45, Pg. ID 438.

At that point, the officers and Isaifan stepped behind a grove of trees, which obstructed the surveillance camera's view of the next five seconds of their confrontation. But at their depositions, the officers gave a frame-by-frame description of the missing five seconds.

*One*. Rea—close enough to touch Isaifan—saw him move toward his holster at his right side "real quick." R. 46, Pg. ID 581. Akers watched Isaifan "jam[] his hand down on his pistol" with a "sure grip." R. 45, Pg. ID 439.

*Two*. Akers saw Isaifan's feet spread into a "bladed" fighting stance. *Id.* at 445. In the same "half a second," Rea noticed Isaifan take a small step, as though preparing to spin. R. 46, Pg. ID 579, 581.

*Three*. Akers caught a "clear shift" in Isaifan's hips and shoulders as he started turning toward the officers. R. 45, Pg. ID 440. Rea also observed Isaifan start to rotate, his hips "shift[ing] towards Officer Akers" in "one motion." R. 46, Pg. ID 581.

*Four*. Akers saw the barrel of Isaifan's gun fully clear his holster. From the side, Rea watched Isaifan's arm settle, as though he had finished drawing the weapon and was holding it at his hip. At that point, Rea thought it was "100 percent clear" that Isaifan "was turning with his firearm in his hand towards Officer Akers." *Id*. at 582.

*Five*. Isaifan turned—and both officers fired at point-blank range. Rea fired four rounds at Isaifan. Akers fired ten shots, stopping only when he could see Isaifan's hands were empty. By that point, Akers's only goal was "trying not to die [and] have Officer Rea not die." R. 45, Pg. ID 453.

After hearing the first shot, Michael Williams, who lived across the street, rushed to his window—just in time to see the end of the shooting. All told, only 18 seconds had passed between when the officers stepped out of their car and when Williams watched Isaifan hit the ground.

Isaifan died at the scene, his gun next to him. His autopsy showed that he sustained over a dozen gunshot wounds to his front, left side, and back. Based on the autopsy report, a ballistics expert and a shooting scene reconstruction specialist testified that Isaifan's injuries matched the officers' accounts.

Kimberly Vaughn, Isaifan's ex-wife and the administrator of his estate, sued Akers and Rea. *See* 42 U.S.C. § 1983. She asserted that the officers violated Isaifan's Fourth Amendment rights by unreasonably detaining him and using excessive force against him. After discovery, the officers moved for summary judgment based on qualified immunity. The district court granted their motion on both claims. Vaughn timely appealed only the grant of immunity on the excessive-force claim.

II.

Vaughn maintains that the officers aren't entitled to qualified immunity because "all the shots" were an "unnecessary and excessive" use of force. Appellant's Br. at 11. We review a district court's grant of summary judgment based on qualified immunity de novo. *Barton v. Martin*, 949 F.3d 938, 946 (6th Cir. 2020). The officers are entitled to qualified immunity unless Vaughn establishes a genuine dispute of material fact as to whether their conduct "violated [Isaifan's] clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Vaughn hasn't done so.

Vaughn hasn't shown that the officers' use of force was objectively unreasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). The officers believed they were facing a heavily armed suspect who had fled the scene of an accident. When they approached him, he resisted their efforts to detain him and then reached for a weapon. As we've consistently found, officers may reasonably use deadly force against a noncompliant suspect drawing a firearm. *See Puskas v. Delaware County*, 56 F.4th 1088, 1096 (6th Cir. 2023) (collecting cases). In this context, Rea's and Akers's split-second choice to repeatedly use deadly force was objectively reasonable.

Start with the choice to use deadly force. Throughout the incident, the officers believed they were interacting with a suspect armed with a gun (and holding a grenade). That suspect

then ignored commands to show his hands, walked menacingly toward officers, and resisted their efforts to detain him. *See Chappell v. City of Cleveland*, 585 F.3d 901, 904–05, 916 (6th Cir. 2009) (granting qualified immunity to officers who shot noncompliant suspect advancing on them with a knife); *Thornton v. City of Columbus*, 727 F. App'x 829, 830–31, 837 (6th Cir. 2018) (granting qualified immunity to officers who repeatedly shot a noncompliant suspect advancing on them with a gun). A split second later, Isaifan unholstered his firearm, gripped it, and started to turn toward the officers. *See Eastep v. City of Nashville*, 156 F.4th 819, 824, 829 (6th Cir. 2025) (granting qualified immunity after officers shot a suspect turning toward them while raising what they believed to be a weapon); *Lemmon v. City of Akron*, 768 F. App'x 410, 412–13 (6th Cir. 2019) (granting qualified immunity to officers who shot a suspect four times after he "made a quick movement" toward them). So as our caselaw makes clear, the officers' choice to use deadly force against Isaifan—an armed suspect who refused to comply with orders while reaching for a weapon—was reasonable.

Nor was the degree of deadly force unreasonable. As the officers explained, they continued to shoot until they "perceived [Isaifan] was no longer a threat." R. 45, Pg. ID 452. They reached that point only once they could tell "his hands were empty and there was no gun." *Id.* In similar circumstances, courts have held that an officer's decision to shoot until a suspect was neutralized was reasonable. *See Plumhoff v. Rickard*, 572 U.S. 765, 768, 770 (2014) (granting qualified immunity to officers who fired 15 shots at a suspect fleeing in his car); *Pollard v. City of Columbus*, 780 F.3d 395, 398, 400 (6th Cir. 2015) (granting qualified immunity to officers who shot 80 bullets at a noncompliant suspect, 23 of which hit him); *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 152–53 (6th Cir. 2013) (granting qualified immunity to officers who fired 20 shots at a defendant driving away in his car, nine of which hit him). In short, the key question for courts to ask isn't how many times an officer may pull the trigger in a dangerous situation where split-second decisions can be the difference between life and death. Rather, the question courts must ask is whether the officers stopped shooting once they knew the suspect was neutralized. *See, e.g.*, *Eastep*, 156 F.4th at 831. And here, the officers stopped shooting when the suspect was neutralized. So neither the officers' use of deadly force nor the number of bullets fired was unreasonable.

In response, Vaughn argues that three sources of evidence create material factual disputes about whether the officers' use of force was excessive. None does.

*First*, Vaughn argues that the surveillance footage creates a genuine dispute of material fact because it shows the officers shooting Isaifan as he runs away. But the footage doesn't show that. A grove of trees and a pole obstruct the key moment when Isaifan unholstered his gun and turned toward the officers. So, as the district court concluded, a jury couldn't use the surveillance footage to discern whether Isaifan was fleeing at the time of the shooting. *See Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 601 (6th Cir. 2025). The grainy, partially obstructed footage doesn't create a triable factual issue.

*Second*, Vaughn asserts that Williams's eyewitness testimony creates a genuine dispute about whether Isaifan was fleeing when the officers shot him. But the reasonableness of the officers' use of force here depends on the events leading up to the shooting. And Williams admits that he looked out his window only after hearing the first shots. So Williams's testimony about the moments *after* the shooting started can't create a factual dispute about whether Isaifan disobeyed commands, unholstered his weapon, and started to turn toward the officers *before* the shooting. And that lead-up is what matters to Vaughn's excessive-force claim.

Aside from Williams's narrative, Vaughn doesn't advance any evidence to cast doubt on the officers' deposition testimony about the shooting. And at summary judgment, Vaughn can't simply "hope that the trier of fact will disbelieve the [officers'] denial of a disputed fact," but must instead "make an affirmative showing with proper evidence." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quotation omitted). Williams's account of the aftermath of the shooting doesn't affirmatively contradict the officers' testimony about the lead-up to it. Since the officers' description was uncontested, the district court didn't err by treating it as fact.

*Third*, Vaughn claims that the autopsy report creates a genuine dispute about whether Isaifan turned toward the officers because it shows Isaifan was primarily shot in the back. Although the majority of shots hit Isaifan's back, the autopsy also confirms that Isaifan was shot six times in the front. The medical examiner later stated that the pattern of wounds supported the "reasonable assumption . . . that Isaifan was rotating during the actual shooting." R. 42-3, Pg. ID

254. The government's forensic experts lent additional—and uncontested—support to this analysis. As the government's ballistics expert stated, the "various shot paths . . . coming from both front and back" showed that Isaifan was "turning" or "falling" during the shooting. R. 42-6, Pg. ID 329. And based on multiple CGI reconstructions, the government's crime-scene specialist likewise agreed that the evidence was "consistent with the officers['] testimony" that Isaifan was rotating toward them. R. 42-7, Pg. ID 360. Far from creating a genuine dispute, the autopsy and forensic evidence corroborate the officers' narrative of the shooting.

All told, Vaughn hasn't established any genuine dispute of material fact about the shooting. Based on this record, a reasonable juror couldn't find that the officers violated Isaifan's Fourth Amendment rights. The officers are thus entitled to qualified immunity.

* * *

We affirm.